(164 App. Div. 196)

### SHAW v. ROTHSCHILD REALTY CO. (No. 6116.)

(Supreme Court, Appellate Division, First Department. November 6, 1914.)

1. TRIAL (§ 89*)—RECEPTION OF EVIDENCE—STRIKING OUT.

In a personal injury action by a servant, notices, put in evidence, purporting to be under the Employers' Liability Act (Consol. Laws, c. 31, §§ 200–204), should be stricken, where there was no evidence offered in support of the act of negligence alleged in the notices.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 228–234; Dec. Dig. § 89.*]

---

2. MASTER AND SERVANT (§ 286*)—INJURIES TO SERVANT—ACTIONS—INSTRUCTIONS.

Where plaintiff was hurt while cleaning the cables of an elevator with waste, which he held against them as they ran out and came back with the motion of the car, the act of defendant's superintendent in requiring the elevator operator to reverse the motion of the car could not be held negligence as a matter of law, where plaintiff's only request to the operator was that he run the car clear down to the basement, and that had been done.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. § 286.*]

3. EVIDENCE (§ 265*)—ADMISSIONS OF AGENT—EFFECT.

Where plaintiff was hurt while cleaning the cables of defendant's elevator, an admission by defendant's superintendent that the accident was caused by his negligence in requiring the operator to reverse the motion of the car is not evidence against defendant that he was in the car and caused such change, for it is not within the scope of an agent's authority to make admissions against his principal.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1029–1050; Dec. Dig. § 265.*]

4. MASTER AND SERVANT (§ 286*)—INJURIES TO SERVANT—JURY QUESTION.

In an action by a servant, hurt while cleaning the cables of an elevator, it was improper to submit to the jury generally the question whether the master was guilty of negligence in failing to promulgate rules for the cleaning of such cables, where there was no evidence of customary rules for cleaning such cables, or that the promulgation of rules was practicable.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. § 286.*]

Appeal from Trial Term, New York County.

Action by William J. Shaw, an infant, by William C. Shaw, his guardian ad litem, against the Rothschild Realty Company. From a judgment for plaintiff, and an order denying a new trial, defendant appeals. Reversed and remanded.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Edward F. Lindsay, of New York City, for appellant.

Lorenzo D. Armstrong, of New York City, for respondent.

LAUGHLIN, J. This is an action in behalf of an employé against his employer to recover for personal injuries alleged to have been caused by negligence. The plaintiff charged both a failure of common law and statutory duty. The plaintiff became 18 years of age on the 25th of August, 1911, and in the fore part of the following month he entered the employ of the defendant at its 16-story loft building No. 79–83 Fifth avenue, borough of Manhattan, New York. Plaintiff testified that he was hired at $35 per month by one Reid, the assistant engineer in charge at the building, who showed him how to trim an arc light and introduced him to one Wilson, who had been performing the duties to which plaintiff was assigned, which consisted principally of cleaning the machinery around the elevators, and directed Wilson to instruct him with respect to his duties; that Wilson

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

showed him how to sandpaper the copper discs which operated the controls of the elevators, and to remove the oil that was thrown out from the gears, and directed him to clean the machinery connected with the four elevators at the rear of the building, and told him that it was his duty to clean the cables of those elevators about once a month, and said that "at some time later he would show me the method used," but that Wilson never showed him how to clean the cables; that in October, by direction of one Speth, who was an electrician in charge of the elevators of the building under Reid, he went to a building across the street, which was also owned by the defendant, to observe the manner in which one Turner, who was employed there, cleaned the elevators in that building, and that he worked with Turner and observed the manner in which the latter cleaned the cables, which was by dipping waste in kerosene and holding it around the cables as they came off the drum and allowing them to run through it while the elevator was in motion; that after thus observing Turner he performed his regular duties for a couple of days, and then determined to clean the cables of the elevators in the building in which he was employed, and for this purpose obtained a pail of kerosene from the engine room and proceeded to elevator No. 2 with a view to going on the roof; that he there met Reid, and, in answer to an inquiry by the latter as to where he was going, said that he was "going up to clean the cables on No. 2 elevator," to which Reid replied, "All right"; that he then boarded the elevator, and on the way up said to Conners, the operator, "When you go down this time, Walter, go all the way down to the engine room"; that he had never attempted to clean an elevator cable before, but that he was familiar with the elevators, and had been accustomed to ride on them, and to go to the top daily to empty the cans containing the oil thrown out from the gears; that he gave this direction to Conners with a view to cleaning the full length of the cables, but did not so state to Conners; that it was his duty also to look after and replace the carbon brushes used in the operation of the discs on the elevator, and this required him to stop the elevator by pulling out a "breaker," which took the electrical current from the controller of the operator; that at the top of the elevator there was a little room with a metal floor, in which the drum was located; that this room was light, and the cables passed through slits in the floor to the drum and to a wheel or sheave; that one set of cables attached to the car passed around the drum and over the wheel or sheave situated in front of it, and then to the counterweights, and another passed from the car directly over another wheel or sheave to the counterweights; that the drum was about 4 feet in diameter and 5 feet long, and each wheel or sheave was about 3 feet in diameter and about 3 feet from the drum diagonally up; that the wheel or sheave over which the cables passed directly from the car to the counterweights was fixed on its axle, but the other wheel or sheave slid from side to side on its axle as the cables wound over or unwound from the drum; that Conners followed his direction and first ran the elevator down to the bottom of the shaft, and he cleaned the cables that were then passing directly from the counterweights over the wheel or

sheave down to the elevator, and in so doing he took hold of them
with the waste saturated with kerosene after they had passed over
the wheel or sheave and were descending toward the floor; that he
was obliged to take hold quite firmly, for the reason that the cables had
considerable velocity; that the car stopped several times, and each
time he let go and saturated the waste with kerosene; that after
cleaning those cables he waited for the car to start to come up, and
then he proceeded to clean the other set of cables, which were unwind-
ing from the drum upon the wheel or sheave, seizing them in his
hands with the waste saturated with kerosene as before; that he
took hold of those cables about 15 or 20 inches from the drum, and
after the car had come up eight or nine stories it stopped, and he
took his hands off "and got a fresh supply of kerosene, and then after
the cables had started in motion I applied my hands again, but all
of a sudden I felt my hand going down, and before I realized what
had happened my fingers were crushed in between the cables and the
drum, and I was pulled underneath the drum"; that he thereby sus-
tained the injuries for which he seeks to recover damages; that the
accident was caused by the sudden reversal of the car from the up-
ward to the downward motion; that he was looking at the cables when
they reversed, and tried to let go, but that the reversal was so sudden
and quick that he was not able to do so in time to avoid the injuries.

Wilson, who the plaintiff claims instructed him to clean the cables,
did not testify, and Reid did not specifically controvert plaintiff's tes-
timony to the effect that he informed Reid that he was going up to
clean the cables and that he replied, "All right"; but the defendant
gave evidence tending to show that the cables were never cleaned, and
Reid testified that on one occasion he saw plaintiff attempting to
clean cables and stopped him, and warned him against attempting it
again under pain of discharge. Turner, who was called as a witness
by plaintiff, testified on cross-examination that on the occasion when
plaintiff observed him he cleaned the cables by putting the waste on
them as they passed over the surface of the drum, and not as plaintiff
testified.

[1] A notice and a supplemental notice purporting to be under
the Employers' Liability Act (Consol. Laws, c. 31, §§ 200-204), served
on the defendant, were received in evidence before any testimony was
offered. Counsel for defendant objected to the notices on the ground
that they were insufficient, and on the further ground that on plain-
tiff's opening the cause of action, if any, was at common law. Plain-
tiff alleged negligence on the part of the superintendent in ordering
the car, which was ascending, to be suddenly reversed, and so charged
in the notices under the Employers' Liability Act; but no evidence was
offered on plaintiff's affirmative case tending to show that the super-
intendent gave any order with respect to the reversal of the direction
of the car, or did any other negligent act. When the plaintiff rested,
the defendant moved to strike out the notices on the ground that no
statutory cause of action was shown. The motion was denied, and
an exception was duly taken. I am of opinion that the motion should
have been granted. The failure of the court to grant it led to the in-

troduction of certain testimony, to which reference will be made presently, upon which the learned trial court fell into error in instructing the jury. It is conceded in the points for the respondent that the only theory of statutory liability on which the recovery can be sustained is the negligence of the superintendent in directing the reversal of the car. The superintendent, Reid, was called as a witness for the defendant, and he testified, among other things, that he was in the engine room at the time of the accident, and that he gave no directions with respect to the operation of the elevator at or about the time of the accident. He was asked on cross-examination if he did not tell plaintiff, or say in the presence of plaintiff, after the accident, that he was on the elevator at the time of the accident and directed Conners to take him to the basement. He answered positively in the negative as to having so stated to plaintiff, and said that he did not remember having so stated to any one. On rebuttal, the plaintiff was permitted, over objection and exception that the evidence was incompetent, irrelevant, and immaterial, to testify that he heard Reid say to the latter's brother after the accident:

"I was up at the triangle floor doing a little repair job, and I got on. Walter [Conners] started up, and wanted me to tell Shaw to stop dripping kerosene down; but I said, 'Take me down,' and then a big splash of kerosene came. He said, 'That must have been when the poor fellow got caught.'"

[2, 3] The court, in submitting the case to the jury, instructed them in effect that they might find that defendant was guilty of negligence and liable on any one or all of three theories, viz.: (1) That it failed to adopt and promulgate proper rules for cleaning the cables; (2) that it failed to warn plaintiff of the danger; and (3) negligence on the part of the superintendent in directing the reversal of the elevator without notice to the plaintiff. With respect to the negligence of the superintendent, the court instructed the jury as follows:

"Now, as to the third element: If you find that, while the plaintiff was engaged in oiling the cables, the defendant's superintendent entered on the elevator, the reversal of which—that is, instead of going up, it reversed and went down—that the reversion of the running of the cable which was in the plaintiff's hands while he was oiling it caused the injury, then you may consider that as a question of negligence, as an act of negligence on the part of the defendant."

No exception appears to have been taken to this charge; but it was manifestly erroneous for two reasons. It, in effect, constituted an instruction to the jury that, if the superintendent directed the reversal of the car, that would be negligence as matter of law. Moreover, there was no evidence that the superintendent was in the car, or that he reversed it, or directed Conners to reverse it. At most, there is evidence that he admitted those facts after the accident. That would have been competent proof of the facts, if the plaintiff had sued the superintendent; but it was not evidence of the facts as against the defendant, for clearly the superintendent was not authorized to bind the defendant by an admission made after the happening of the accident.

[4] It was shown that defendant never made or promulgated any rule or rules with respect to cleaning the cables of the elevators. The

court instructed the jury at the request of counsel for plaintiff that defendant was liable if it "could have foreseen the danger of the injury to the plaintiff and by the exercise of reasonable care could have guarded against it by establishing rules in regard to the cleaning of the cables." There was no evidence of any custom, or that any rule had been adopted and was in general use elsewhere, with respect to cleaning cables of elevators; nor does the evidence show that any rule was practicable. The attention of the jury was not drawn to any theory with respect to a rule, and for aught that appears some of the jurors may have thought that one rule should have been adopted, and others another, and the verdict may be based upon negligence in failing to adopt and promulgate a rule which would not have been practicable.

It is contended on the authority of Knickerbocker v. General Railway Signal Co., 209 N. Y. 404, 103 N. E. 765, that the necessity for some rule was so plain and obvious that the jury might predicate negligence on the omission. We think that the case shown by the record now before the court does not fall within the authority of that decision. It is evident that the plaintiff was quite familiar with the manner in which the elevator worked. He must have known that the elevator was liable to change its course, and whether this would be done slowly or suddenly depended on the operator. The only directions the plaintiff gave the elevator operator were followed. There is too much room for speculation with respect to a rule in these circumstances to leave the question to the jury, without any evidence by which they would be guided.

It follows that the judgment and order should be reversed, and a new trial granted, with costs to appellant to abide the event. All concur.